UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SANJA ILIC,<br><br>Defendant. | Criminal No. 26cr10055<br><br>Violation:<br><br>Count One: Failure to File Adverse Event Reports<br>(21 U.S.C. §§ 331(q)(1)(B), 333(a)(2), and 360(i))<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

1. Sanja Ilic ("Ilic") served as the Chief Regulatory Officer of ExThera Medical Corporation ("ExThera"). Ilic was employed by ExThera from in or around November 2021 through January 2025 and began serving as the CRO in 2023. She also held the roles of Vice President of Regulatory Affairs, Vice President of Clinical Affairs, and Vice President of Medical Affairs, which she continued to hold until her employment with ExThera was terminated. Ilic was responsible for ensuring that ExThera complied with United States laws and regulations enforced by the Food and Drug Administration ("FDA").

2. ExThera was a Northern California-based medical technology company and device manufacturer incorporated in Delaware. ExThera manufactured a blood filtration device that removed pathogens from the bloodstream of patients (the "Device").[1]

---

[1] Depending on its intended use and labeling, the Device had multiple names, including the Seraph® 100 Microbind® Affinity Blood Filter (Seraph 100) and the ONCObind™ Procedure Hemoperfusion Filter.

3. Distributor was a private medical device distribution company based in the British Virgin Islands. Distributor and/or its affiliates used the Device on end stage cancer patients at a medical clinic in Antigua (the "Antigua Clinic").

4. Private Equity Firm was a group of affiliated entities (including Distributor) organized and existing under the laws of the Delaware, the British Virgin Islands, and elsewhere, and with principal places of business in New York, Florida, and elsewhere.

5. Executive 1 was the Director of Medical Affairs and subsequently the Vice President of Medical Affairs for ExThera. Executive 1 resigned from ExThera on or about June 3, 2024.

6. Executive 2 had a long-standing relationship with Private Equity Firm and was a member of ExThera's Board of Directors until on or about September 9, 2024. Executive 2 was involved in fostering the relationship between Private Equity Firm and ExThera.

7. Patient 1 was a resident of Panama City, Florida, who was diagnosed with Stage III esophageal cancer in or around March 2022. Patient 1 passed away on or about April 18, 2024.

8. Family Member 1 was the spouse of Patient 1. Family Member 1 had a background in nursing and maintained a multi-state registered nurse license.

9. Individual 1 was a physician based in the United States.

10. Patient 2 was a U.S. citizen living in Canada. Patient 2 was diagnosed with Stage IV liposarcoma in or around December 2023. Patient 2 passed away on April 19, 2024.

11. Family Member 2 was the spouse of Patient 2. Family Member 2 was a registered nurse who previously worked in pediatrics.

12. Individual 2 was a physician based in the United States.

*The FDA and FDCA*

13.  The FDA was responsible for protecting the health and safety of the American public by ensuring, among other things, that medical devices—including diagnostic testing devices—were safe and effective. Under its statutory mandate, FDA regulated the manufacture, processing, package, labeling, and shipment in interstate commerce of medical devices. As a medical device manufacturer, ExThera was fully subject to the FDA's comprehensive oversight and regulatory requirements.

14.  The Food, Drug, and Cosmetic Act ("FDCA") and its implementing regulations provided a mechanism that allowed the FDA and others to identify and monitor adverse events (deaths and serious injuries) and certain malfunctions involving medical devices. *See* 21 U.S.C. §§ 331(q)(1)(B), 360i; 21 C.F.R. Part 803—Medical Device Reporting. Specifically, the FDCA prohibited the failure or refusal to furnish any notification or other material or information required by or under 21 U.S.C. § 360i, pursuant to 21 U.S.C. § 331(q)(1)(B).

15.  Pursuant to 21 U.S.C. § 360i(a) and 21 C.F.R. Part 803, medical device manufacturers were required to (1) develop, maintain, and implement written procedures for the identification and evaluation of all malfunctions, serious injuries, and deaths to determine whether a Medical Device Report ("MDR") was required for an event; (2) submit MDR reportable events involving their medical devices to the FDA; and (3) establish and maintain complete files for all MDR events. These requirements applied to all manufacturers of medical devices in the United States, regardless of where in the world the device was used.

16. MDRs were one of the post-market surveillance tools that the FDA used to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of devices.

17. Manufacturers were required to file an MDR with the FDA within thirty (30) days of receiving or otherwise becoming aware of information that reasonably suggested that a device the manufacturer marketed (a) may have caused or contributed to a death or serious injury or (b) had malfunctioned and the device or a similar device the manufacturer marketed would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. 21 U.S.C. § 360i(a)(1); 21 C.F.R. § 803.20(b)(3); 21 C.F.R. § 803.50(a). Such reports were referred to as "initial reports." A manufacturer was required to submit relevant information that was "reasonably known" to it, including information that could be obtained by contacting a user facility, importer, or other initial reporter, 21 C.F.R. § 803.50(b)(1)(i), information that was in its possession, 21 C.F.R. § 803.50(b)(1)(ii), and information that it could obtain by analysis, testing, or other evaluation of the device, 21 C.F.R. § 803.50(b)(1)(iii).

18. With respect to an adverse event report, the applicable regulations required a report of "any information, including professional, scientific, or medical facts, observations, or opinions, [that] may reasonably suggest that a device has caused or may have caused or contributed to . . . a death, a serious injury, or . . . a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur." 21 C.F.R. § 803.20(c)(1).

19. Manufacturers who subsequently obtained information about the event that was not known or was not available when the initial report was submitted, but which would have been required to be submitted as part of the initial report had that additional information been known or

available, were required to file a supplemental report or "supplemental MDR" with the FDA within thirty (30) days of receiving the additional information. 21 C.F.R. § 803.10(c)(3); 21 C.F.R. § 803.50(b)(3).

20. Manufacturers had additional duties in connection with these requirements. They were responsible for obtaining and submitting to the FDA information that was incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. 21 C.F.R. § 803.50(b)(2). They were also responsible for conducting an investigation of each event and evaluating the cause of each event. 21 C.F.R. § 803.50(b)(3). If a manufacturer could not submit complete information that was not available at the time it filed its initial report, it was required to provide a statement explaining why this information was incomplete and the steps it took to obtain the information. 21 C.F.R. § 803.50(b)(3). If the manufacturer later obtained any required information that was not available at the time it filed its initial report, it was required to submit this information in a supplemental report under the applicable regulations. 21 C.F.R. § 803.50(b)(3).

21. Not all events needed to be reported to the FDA. A manufacturer did not have to report an adverse event if it had information that would lead a person who was qualified to make a medical judgment reasonably to conclude that a device did not cause or contribute to a death or serious injury, or that a malfunction would not be likely to have caused or contributed to a death or serious injury if it were to recur. 21 C.F.R. § 803.20(c)(2). Persons qualified to make medical judgments included physicians, nurses, risk managers, and biomedical engineers. 21 C.F.R. § 803.20(c)(2). However, the manufacturer was required to keep in its MDR event files (described in 21 C.F.R. § 803.18) the information that the qualified person used to determine whether or not an event was reportable. 21 C.F.R. § 803.20(c)(2).

### ExThera's Blood Filtering Device

22.     ExThera's Device was designated a "Class III" device, which was the FDA's highest risk category for human use. The Device worked in tandem with a dialysis machine, which pumped blood from a patient through a cylinder to be filtered of pathogens before returning to the patient's body. ExThera had not obtained FDA premarket approval for commercial distribution of the Device for use on patients in the United States.

23.     In April 2020, ExThera received an Emergency Use Authorization ("EUA") from the FDA to treat certain patients with confirmed COVID-19 infections who were (i) "admitted to the intensive care unit (ICU) with" (ii) "confirmed or imminent respiratory failure."[2] The FDA's EUA for the Device reflected conclusions that the Device "may be effective at treating certain patients with confirmed COVID-19" and "may provide clinical benefit." The EUA expressly prohibited ExThera from stating or suggesting that the Device was "safe or effective for the prevention and treatment of COVID-19." ExThera also obtained Investigational Device Exemptions allowing for certain limited clinical study uses, including treating sepsis and a certain form of pancreatic cancer. In Europe, the Device had received CE mark authorization for removal of blood-borne pathogens.[3]

---

[2] ExThera agreed to withdraw the EUA in or around October 2025.
[3] CE marking indicates that a product has met European Union health, safety, and environmental requirements, and may be traded freely in the European Union.

### Overview

24. In or around December 2023, Private Equity Firm obtained equity in ExThera, and ExThera and the Distributor entered into a distribution agreement under which the Distributor would purchase Devices, including through an upfront payment of $10 million.[4]

25. In or around January 2024, Distributor and its affiliates established a clinic in Antigua to treat patients using the Device, including patients with advanced-stage cancer.

26. When the Antigua Clinic first opened in and around January 2024, ExThera personnel, including Ilic, traveled to the site to train clinic personnel and observe the use of the Device on American cancer patients. ExThera personnel—including Ilic—also spoke directly with patients and their family members about treatments with the Device, as well as with physicians who referred those patients to the Antigua Clinic. The first treatments were provided at the Antigua Clinic in or around January 2024.

27. Some patients, many of whom were United States residents, agreed to pay, and did pay, up to approximately $45,000 to Distributor per trip for treatment with the Device.

28. Although Ilic knew and understood the requirements for adverse event reporting, she intentionally failed to report adverse events associated with the Device for patients treated at the Antigua Clinic.

*Ilic's Background and Knowledge*

29. As part of her job duties and responsibilities as the CRO, Vice President of Regulatory, Clinical, and Medical Affairs, Ilic was tasked with ensuring that ExThera's products complied with FDA regulations.

---

[4] When the parties' agreement was terminated in October 2024, ExThera returned $3,676,111.93.

30.     For example, ExThera's Medical Device Reporting Policy identified the Vice President of Regulatory and Clinical Affairs as the responsible official for evaluating adverse events or complaints, determining whether an event was reportable, and if so, completing and submitting the appropriate reports.

31.     Ilic worked for more than twenty years in regulatory affairs, clinic development and full product life cycle management. She described herself as an internationally recognized expert in the field of regulatory and clinical development strategy. She was credentialed with a Regulatory Affairs Certification since 2004 and was recertified multiple times.

32.     During 2024, including while patients were being treated at the Antigua Clinic, Ilic was directly involved in advancing a U.S.-based clinical research study into the use of the Device in patients with cancer. That clinical study was permitted under an Investigational Device Exemption issued by the FDA on or about July 13, 2023. The clinical study required oversight by the FDA, as well as oversight and approval by the U.S. clinical cancer center hosting the study.

33.     Shortly before the Antigua Clinic began to treat patients with the Device, when experience with the Device in cancer patients was limited, Ilic documented her knowledge about potential Device-related adverse events in an email to some members of ExThera senior management. On or about December 18, 2023, she explained in an email how side effects and/or adverse reactions could theoretically occur during use of the Device itself, as well as other related procedures. These potential events included hypersensitivity reactions, hypotension,

anemia/decreased hematocrit, hypovolemia, thrombocytopenia, cardiac dysrhythmia, hemolysis, hematoma formation at the venipuncture site, chest pain, and dyspnea.[5]

34. Despite her experience, training, and knowledge of FDA adverse event reporting, and her responsibility on behalf of ExThera to do so, Ilic did not properly address potentially reportable adverse events, including the deaths of two patients treated with the Device at the Antigua Clinic.

*Ilic Concealed Patient 1's Post Filtration Experiences and Death from the FDA*

35. Despite repeated contact with Family Member 1 over several months about Patient 1's status and issues related to Patient 1's treatment, Ilic intentionally failed to notify the FDA regarding adverse events following Patient 1's use of the Device at the Antigua Clinic. Among other events, she intentionally failed to report Patient 1's death to the FDA.

36. On or about February 7, 2024, Family Member 1 began communicating with Ilic about using the Device to treat Patient 1, who was battling advanced cancer.

37. After speaking with Ilic, Patient 1 and Family Member 1 traveled to Antigua for filter treatments in February 2024. Patient 1 received filter treatments between on or about February 28, 2024, and March 3, 2024.

38. Following the procedures, Family Member 1 updated Ilic about Patient 1's status, explaining that Patient 1 "felt worse" and experienced "more pain" in the first week following treatment at the Antigua Clinic.

---

[5] Patients, including Patient 1 and Patient 2, or their family members, reported that they experienced some of these medical events after being filtered with the Device at the Antigua Clinic.

39. Ilic told Family Member 1 that Patient 1 was feeling worse because the filtering at the Antigua Clinic had caused "strong immune activation"—*i.e.*, it was effective—and that increases in cancer detection testing indicated cancer die-off.

40. In or around March 2024, Family Member 1 sent subsequent text messages to Ilic informing her that Patient 1's tumor markers were increasing and that Patient 1 "continued to feel bad." In addition, Family Member 1 told Ilic that Patient 1 had a "severe pleural effusion" and was "extremely short of breath." Family Member 1 continued to provide information to Ilic on Patient 1's bloodwork and reports.

41. On or about March 13, 2024, Individual 1 emailed Executive 2 seeking additional information stating, "I am worried that two of my patients are getting worse after their filter treatment and I don't have enough information to deliver optimal care to those patients." Executive 2 forwarded this email to Ilic and others, stating Individual 1 "is worried that both patients are showing evidence that the cancer is spreading and is considering [the] best path forward on their treatment."

42. On or about March 14, 2024, Family Member 1 texted Ilic stating, "[Family Member 1] wanted to ask [Ilic] about tumor markers. [Patient 1's] CEA [which is a carcinoembryonic antigen, a protein that can be found in higher amounts in individuals with certain types of cancer] before filtering was 25. This week it was 338."

43. In and around late March 2024, in a telephone conversation about Patient 1's treatments, Family Member 1 asked Ilic if she was "strongly opposed to doing anything else to boost immune response like immunotherapy or chemo in between the filters." Ilic replied that "chemo will totally destroy him."

10

44.     On or about April 6, 2024, Family Member 1 updated Ilic on the treatment provided at the Antigua Clinic. Family Member 1 wrote to Ilic that a filter had clogged and asked Ilic for her thoughts on why it clogged. Ilic advised that Patient 1 should not get any additional filtering "knowing [Patient 1's] labs from last month."

45.     Approximately three days later, on or about April 9, 2024, Family Member 1 wrote to Ilic, "This is an emergency and I need help. Please call me[.]" Family Member 1 sent multiple reports accompanied by the message "What does this mean??!!!!" and a sad emoji. Family Member 1 texted that Patient 1's "scan was horrible and . . . clinical picture doesn't look good." Ilic did not respond.

46.     Patient 1 died on or about April 18, 2024, after returning to the United States from the Antigua Clinic because of Patient 1's deteriorating health. Family Member 1 sent Ilic a link to Patient 1's obituary on or about April 21, 2024. She did not respond.

47.     On or about April 26, 2024, Ilic informed Executive 1 about Patient 1's death. Ilic and Executive 1 discussed reporting requirements to the FDA, and Ilic refused to report any adverse events, despite her awareness of Patient 1's complications and death in the United States and her knowledge and experience with adverse event reporting. Ilic similarly did not document in ExThera's MDR files any reason why she concluded Patient 1's death was not reportable pursuant to FDA requirements.

48.     In 2025, following public reporting about the Device and after Ilic was terminated, ExThera filed several adverse event reports with the FDA related to Patient 1's use of the Device to treat cancer outside the United States. Among other things, ExThera reported to the FDA that Patient 1 "saw progression of . . . cancer after treatment" and aggressive tumor growth, as well as

a pleural effusion, trouble breathing, and other experiences following Patient 1's use of the Device at the Antigua Clinic.

*Ilic Concealed Patient 2's Post Filtration Experiences and Death from the FDA*

49. In March and April 2024, Ilic was also informed about Patient 2's treatment in Antigua. Despite her knowledge and awareness of Patient 2's status, she failed to notify the FDA regarding adverse events following Patient 2's use of the Device at the Antigua Clinic. Among other events, she intentionally failed to report Patient 2's death to the FDA.

50. Patient 2 was diagnosed with liposarcoma in and around December 2023. In and around January 2024, Patient 2 and Family Member 2 learned of the Device and decided to try it.

51. When they arrived at the Antigua Clinic on or about February 21, 2024, Patient 2 underwent filtration using the Device three times over the next several days.

52. Individual 2, the United States-based physician handling Patient 2's care, was in contact with Ilic and others about Patient 2's status.

53. On or about April 15, 2024, Individual 2 wrote an email to Ilic. In the message, Individual 2 reported that Patient 2 was "doing very poorly, quite critical condition" and "decided to be comfortable." Individual 2 passed on a message from Patient 2's father, stating that, among other things, Patient 2's internist reported Patient 2 was experiencing tumor lysis syndrome, a potentially life-threatening complication of cancer treatment. Patient 2's father stated that Patient 2's "heart was also acting up with really high brats to compensate for the really low blood pressure," had left leg pain, and was put on oxygen.

54. Later that day, Individual 2 sent an email to Ilic and others. Individual 2 reported that the tumor was "50% larger" and Patient 2 moved to hospice care.

55.   Patient 2 died on April 19, 2024, the day following Patient 1 passing away.

56.   Despite awareness of Patient 2's deteriorating condition and death, Ilic failed to report any adverse events to the FDA and did not document in ExThera's MDR files any reason why the deteriorating condition and death were not reportable.

57.   In 2025, following public reporting about the Device and after Ilic was terminated, ExThera filed several adverse event reports with the FDA related to Patient 2's use of the Device to treat cancer outside the United States. Among other things, ExThera reported to the FDA that Patient 2's tumor had grown significantly and that Patient 2 was diagnosed with tumor lysis syndrome following Patient 2's use of the Device at the Antigua Clinic.

## COUNT ONE
### Failure to File Adverse Event Reports
(21 U.S.C. § 331(q)(1)(B), 333(a)(2), and 360(i))

The United States Attorney charges that:

58.    The United States re-alleges and incorporates by reference paragraphs 1-57.

59.    From on or about March 14, 2024 through on or about January 12, 2025, in the District of Massachusetts and elsewhere, the defendant,

### SANJA ILIC,

did with intent to defraud and mislead fail to submit to the United States Food and Drug Administration adverse event reports, as required by law, after receiving information concerning serious adverse events associated with the use of the Device.

All in violation of Title 21, United States Code, Sections 331(q)(1)(B), 333(a)(2), and 360(i).

## FORFEITURE ALLEGATION
## (18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

60. Upon conviction of the offense in violation of Title 21, United States Code, Sections 331(q)(1)(B), 333(a)(2), and 360(i), set forth in Count One, the defendant,

SANJA ILIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following:

    a. $661,563.48 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

61. If any of the property described in Paragraph 60, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant—

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 60 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

LEAH B. FOLEY
United States Attorney

By: *[signature]*
WILLIAM F. ABELY
Chief, Criminal Division
MACKENZIE A. QUEENIN
Chief, Health Care Fraud Unit
SARAH B. HOEFLE
Assistant U.S. Attorney

LORINDA LARYEA
Chief, Fraud Section
U.S. Department of Justice
Criminal Division, Fraud Section

*[signature]*
KEVIN LOWELL
Assistant Chief, Fraud Section
WILLIAM SCHURMANN
Assistant Chief, Fraud Section
JOHN HOWARD
MARNEE RAND
SARAH ROCHA
Trial Attorneys, Fraud Section

Date: March 5, 2026