

**U.S. Department of Justice**

*Leah B. Foley*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 3, 2026

**Via Email**

Nicholas B. Johnson, Esq.
Oberheiden, P.C.
nick@federal-lawyer.com

> Re:  United States v. Sanja Ilic
>       Criminal No.

Dear Attorney Johnson:

The United States Attorney for the District of Massachusetts, the Fraud Section of the United States Department of Justice (jointly, the "Government"), and your client, Sanja Ilic ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

1.    Change of Plea

Defendant will waive Indictment and plead guilty to Count One of the Information: failure to report adverse events in violation of 21 U.S.C. §§ 331(q)(1)(B) & 333(a)(2). Defendant admits that Defendant committed the crime specified in this count and is in fact guilty. Defendant agrees to venue of the case in the District of Massachusetts. Defendant knowingly waives any applicable statute of limitations and any legal or procedural defects in the Information. Defendant agrees that the facts set forth in the attached Agreed Statement of Facts are true and accurate.

2.    Penalties

Defendant faces the following maximum penalties: incarceration for three years; supervised release for one year; a fine of the greatest of $250,000 or twice the gross gain or twice the gross loss pursuant to 18 U.S.C. § 3571; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

Defendant understands that, if Defendant is not a United States citizen by birth, pleading guilty may affect Defendant's immigration status. Defendant agrees to plead guilty regardless of

1

any potential immigration consequences, even if Defendant's plea results in being automatically removed from the United States.

3.    Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 23:

a)  Defendant's base offense level is 6 (USSG § 2N2.1(c)(1));

b)  Defendant's offense level is increased by 18, because the loss was more than $3.5 million but less than $9.5 million (USSG § 2B1.1(b)(1)(J);

c)  Defendant's offense level is increased by 2, because the offense involved conscious or reckless risk of death (USSG § 2B1.1(b)(16))); and

d)  Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crime (USSG § 3E1.1); and

Defendant understands that the Court is not required to follow this calculation or even to sentence Defendant within the Guidelines and that Defendant may not withdraw Defendant's guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the Government reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the Government's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    Sentence Recommendation

The Government agrees to recommend the following sentence to the Court:

a)  incarceration for 34 months;

b)  a fine within the Guidelines sentencing range as calculated by the Court at

2

sentencing, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

c) 12 months of supervised release;

d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing; and

e) forfeiture as set forth in Paragraph 6.

Defendant agrees that all criminal monetary penalties, including special assessment, restitution, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

5.      Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a) Defendant will not challenge Defendant's conviction on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b) Defendant will not challenge Defendant's sentence, including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence, regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.

Defendant is agreeing to give up these rights at least partly in exchange for concessions the Government is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later

claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6.    Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a.    $661,563.48 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $661,563.91 is subject to forfeiture on the grounds that it is equal to the amount of proceeds Defendant derived from the offense. Defendant further admits and agrees that the offense relates to a health care benefit program, as defined in 18 U.S.C. § 24.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crime to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the Government requests, Defendant shall deliver to the Government within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the Government. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the Government.

4

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7.    Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

8.    Breach of Plea Agreement

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the Government the right to be released from the Government's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.    Who is Bound by Plea Agreement

This Agreement is only between Defendant, the District of Massachusetts, and the Fraud Section of the United States Department of Justice. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.    Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

If this letter accurately reflects the agreement between the Government and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Mackenzie A. Queenin.

Sincerely,

LEAH B. FOLEY
United States Attorney

By: _____

WILLIAM F. ABELY
Chief, Criminal Division
MACKENZIE A. QUEENIN
Chief, Health Care Fraud Unit
SARAH HOEFLE
Assistant United States Attorney


LORINDA LARYEA
Chief, Fraud Section
U.S. Department of Justice
Criminal Division, Fraud Section

_____

KEVIN LOWELL
Assistant Chief, Fraud Section
WILLIAM SCHURMANN
Assistant Chief, Fraud Section
JOHN HOWARD
SARAH ROCHA
Trial Attorneys, Fraud Section

3/5/26

_____

6

ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts and the United States Department of Justice, Fraud Section. There are no unwritten agreements between me and the Government, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.


sanjailic
Sanja Ilic
Defendant

Date:    sanjailic


I certify that Sanja Ilic has read this Agreement and that we have discussed what it means. I believe Sanja Ilic understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the Government has not extended any other offers regarding a change of plea in this case.


Nicholas B. Johnson, Esq.
Attorney for Defendant

Date: 3/3/2026


Signature: sanja ilic

Email: sanjabrp@outlook.com


7

# Ilic Plea Agreement 2026_03_03 evening

Final Audit Report                                              2026-03-04

| | |
|---|---|
| Created: | 2026-03-04 |
| By: | Nicholas Johnson (johnson@federal-lawyer.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAaUqF7kvFKq6sIhaHvng_FJgydjNdt_7 |

## "Ilic Plea Agreement 2026_03_03 evening" History

Document created by Nicholas Johnson (johnson@federal-lawyer.com)
2026-03-04 - 0:05:44 AM GMT

Document emailed to Dr. Sanja Ilic (sanjabrp@outlook.com) for signature
2026-03-04 - 0:05:48 AM GMT

Email viewed by Dr. Sanja Ilic (sanjabrp@outlook.com)
2026-03-04 - 2:51:55 AM GMT

Document e-signed by Dr. Sanja Ilic (sanjabrp@outlook.com)
Signature Date: 2026-03-04 - 2:52:19 AM GMT - Time Source: server

Agreement completed.
2026-03-04 - 2:52:19 AM GMT

Adobe Acrobat Sign

**STATEMENT OF FACTS**

The following facts establish beyond a reasonable doubt the charge set forth in the criminal Information.

I.      **Overview**

1.      ExThera, a Northern California-based medical technology company and device manufacturer, secured an exclusive agreement with a private medical device distribution company (the "Distributor").  Distributor and/or its affiliates used ExThera's blood filtration device (the "Device") on end stage cancer patients at a medical clinic in Antigua (the "Antigua Clinic"). Throughout in or around 2024, cancer patients and their families traveled from the United States to the Antigua Clinic believing that the Device may help treat their own or their loved ones' cancer. Some patients or their families reported that the patients suspended chemotherapy or delayed starting chemotherapy to undergo treatment with the Device.  The Device had not—and to this day has never—obtained full U.S. Food & Drug Administration ("FDA") approval or clearance for any condition.[1]

2.      At the time it undertook a business relationship with the Distributor, ExThera had never been profitable despite receiving financing of more than $70 million.  The exclusive distribution agreement that ExThera secured with the Distributor delivered an immediate $10 million cash payment to ExThera, generating excitement among management and investors. According to its own financial projections, ExThera could generate up to an additional $150

---

[1] However, as described in more detail below, ExThera had received an Emergency Use Authorization ("EUA") from the FDA to treat certain patients with confirmed COVID-19 infections and had also obtained Investigational Device Exemptions allowing for certain limited clinical study uses, including treating sepsis and a certain form of pancreatic cancer.  The Device had also been approved in Europe for the removal of blood-borne pathogens.

million in revenue from its partnership with the Distributor and distribution of the Device to Antigua and other offshore locations.

3.      At the time of ExThera's distribution agreement with the Distributor, Sanja Ilic ("Ilic"), then ExThera's Chief Regulatory Officer, was responsible for ensuring that ExThera complied with United States laws and regulations enforced by the FDA.  Among other things, Ilic was responsible for reporting adverse events to the FDA.  Adverse events included instances in which a medical device, for example, may have caused or contributed to serious injury or death of a person.  Critically, the FDA relied on adverse event reports filed by companies to protect the public from potentially harmful and dangerous products or medical devices.  In the event that a medical technology company, such as ExThera, concealed adverse events from the FDA, it would undermine the FDA's ability to protect Americans from potentially dangerous medical devices.

4.      Just prior to the start of the treatments at the Antigua Clinic, in December 2023, Ilic circulated an email to some of ExThera's leadership and regulatory staff titled, "Potential Device-Related Adverse Events."  In that email, Ilic provided a list of potential adverse events, including potentially "life-threatening" complications, that patients could experience from use of the Device. As described below, at least some of the patients at the Antigua Clinic and their treating physicians reported that they believed those patients had subsequently experienced some of these medical events after being filtered with the Device.

5.      While treatments were being administered at the Antigua Clinic, Ilic learned contemporaneously of patients developing serious health conditions and/or dying soon after they were treated with the Device.  Ilic specifically learned of the declining health and deaths of at least two patients who died within days of each other in and around April 2024.

6.      During her tenure as Chief Regulatory Officer of ExThera, Ilic did not report the declining health and two deaths to the FDA, or alternatively, document any findings that these events were unrelated to the Device, though she was required to take one of those courses of action under the FDA's regulations and ExThera's own policies and procedures.

7.      Ilic intentionally concealed the declining health and deaths of the two American patients with the specific intent to defraud and mislead the FDA.  Ilic understood that disclosure would have triggered regulatory scrutiny from the FDA, caused clinical trial partners to potentially withdraw their participation, and jeopardized ExThera's and Ilic's potential, future financial prospects.  Rather than comply with her legal obligation to report the events (or document medical findings that the declining health and deaths were unrelated to the Device), Ilic chose to suppress this critical information to defraud and mislead the FDA and keep the agency unaware of these adverse events.

## II.      Relevant Agencies, Entities, and Individuals

8.      The FDA played a critical role in protecting the health and safety of the American public by ensuring that, among other things, medical devices intended for use in the treatment of human beings were safe and effective.

9.      ExThera was a Delaware corporation with its principal place of business in Martinez, California.  ExThera was a medical device manufacturer and, as such, was fully subject to the FDA's comprehensive oversight and regulatory requirements.  Among other things, ExThera was required to promptly report to the FDA any adverse events involving its devices where the device may have caused or contributed to serious death or injury.

10.      Ilic was employed by ExThera in or around November 2021 through January 2025. During 2024 through her termination from ExThera in January 2025, Ilic was the Chief Regulatory

Officer, as well as Vice President of Regulatory Affairs, Vice President of Clinical Affairs, and Vice President of Medical Affairs. Ilic was a salaried employee and held stock options in ExThera that linked her own future financial prospects to ExThera's.

11.    Private Equity Firm referred to a group of affiliated entities (including Distributor) organized and existing under the laws of the Delaware, the British Virgin Islands, and elsewhere, and with principal places of business in New York, Florida, and elsewhere.

12.    Consulting Entity was a limited liability company operating as a consulting firm with a business address in Carlsbad, California—the same address as Ilic's home address. Ilic owned and controlled Consulting Entity.

13.    Executive 1 was the Director of Medical Affairs and subsequently the Vice President of Medical Affairs for ExThera. Executive 1 resigned from ExThera on or about June 3, 2024.

14.    Executive 2 had a long-standing relationship with Private Equity Firm and was a member of ExThera's Board of Directors until on or about September 9, 2024. Executive 2 was involved in fostering the relationship between Private Equity Firm and ExThera.

15.    Patient 1 was a resident of Panama City, Florida, who was diagnosed with Stage III esophageal cancer in or around March 2022. Patient 1 passed away on or about April 18, 2024.

16.    Family Member 1 was the spouse of Patient 1. Family Member 1 had a background in nursing and maintained a multi-state registered nurse license. For 25 years she worked in occupational health for the roofing company she started with her husband, Patient 1.

17.    Individual 1 was a physician based in the United States.

18.    Patient 2 was diagnosed with Stage IV liposarcoma in or around December 2023. Patient 2 passed away on April 19, 2024.

19.     Family Member 2 was the spouse of Patient 2.  Family Member 2 was a registered nurse who previously worked in pediatrics.

20.     Individual 2 was a physician based in the United States.

## III.     Relevant Laws and Regulations

21.     The Food, Drug, and Cosmetic Act ("FDCA") and its implementing regulations provided a mechanism that allowed the FDA and others to identify and monitor adverse events (deaths and serious injuries) and certain malfunctions involving medical devices.  *See* 21 U.S.C. §§ 331(q)(1)(B), 360i; 21 C.F.R. Part 803—Medical Device Reporting.  Specifically, the FDCA prohibited the failure or refusal to furnish any notification or other material or information required by or under 21 U.S.C. § 360i, pursuant to 21 U.S.C. § 331(q)(1)(B).

22.     Pursuant to 21 U.S.C. § 360i(a) and 21 C.F.R. Part 803, medical device manufacturers were required to (1) develop, maintain, and implement written procedures for the identification and evaluation of all malfunctions, serious injuries, and deaths to determine whether a Medical Device Report ("MDR") was required for an event; (2) submit MDR reportable events involving their medical devices to the FDA; and (3) establish and maintain complete files for all MDR events.  These requirements applied to all manufacturers of medical devices in the United States, regardless of where in the world the device is used.

23.     MDRs were one of the post-market surveillance tools that the FDA used to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of devices.

24.     Manufacturers were required to file an MDR with the FDA within thirty (30) days of receiving or otherwise becoming aware of information that reasonably suggested that a device the manufacturer marketed (a) may have caused or contributed to a death or serious injury or (b)

had malfunctioned and the device or a similar device the manufacturer marketed would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.  21 U.S.C. § 360i(a)(1); 21 C.F.R. § 803.20(b)(3); 21 C.F.R. § 803.50(a).  Such reports were referred to as "initial reports."  Manufacturers were required to submit relevant information that was "reasonably known" to it, including information that could be obtained by contacting a user facility, importer, or other initial reporter, 21 C.F.R. § 803.50(b)(1)(i), information that was in its possession, 21 C.F.R. § 803.50(b)(1)(ii), and information that it could obtain by analysis, testing, or other evaluation of the device, 21 C.F.R. § 803.50(b)(1)(iii).

25.    The standard for filing an adverse event report was low.  The applicable regulations required a report of "any information, including professional, scientific, or medical facts, observations, or opinions, [that] may reasonably suggest that a device has caused or may have caused or contributed to . . . a death, a serious injury, or . . . a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."  21 C.F.R. § 803.20(c)(1).

26.    Manufacturers who subsequently obtained information about the event that was not known or was not available when the initial report was submitted, but which would have been required to be submitted as part of the initial report had that additional information been known or available, were required to file a supplemental report or "supplemental MDR" with the FDA within thirty (30) days of receiving the additional information.  21 C.F.R. § 803.10(c)(3); 21 C.F.R. § 803.50(b)(3).

27.    Manufacturers had additional duties in connection with these requirements.  They were responsible for obtaining and submitting to the FDA information that was incomplete or missing from reports submitted by user facilities, importers, and other initial reporters.  21 C.F.R.

§ 803.50(b)(2). And they were responsible for conducting an investigation of each event and evaluating the cause of each event. 21 C.F.R. § 803.50(b)(3). If a manufacturer could not submit complete information that was not available at the time it filed its initial report, it was required to provide a statement explaining why this information was incomplete and the steps it took to obtain the information. 21 C.F.R. § 803.50(b)(3). If the manufacturer later obtained any required information that was not available at the time it filed its initial report, it was required to submit this information in a supplemental report under the applicable regulations. 21 C.F.R. § 803.50(b)(3).

28. Not all events needed to be reported to the FDA. A manufacturer did not have to report an adverse event if it had information that would lead a person who was qualified to make a medical judgment reasonably to conclude that a device did not cause or contribute to a death or serious injury, or that a malfunction would not be likely to have caused or contributed to a death or serious injury if it were to recur. 21 C.F.R. § 803.20(c)(2). Persons qualified to make a medical judgment included physicians, nurses, risk managers, and biomedical engineers. 21 C.F.R. § 803.20(c)(2). However, the manufacturer was required to keep in its MDR event files (described in 21 C.F.R. § 803.18) the information that the qualified person used to determine whether or not an event was reportable. 21 C.F.R. § 803.20(c)(2).

29. Adverse events that were reported to the FDA were also published in the FDA's Manufacturer and User Facility Device (MAUDE) Database. The MAUDE Database allowed patients, medical providers, and other members of the public to learn about adverse events.

**IV.    ExThera's Blood Filtering Device**

30. ExThera developed and manufactured the Device that removed pathogens from the bloodstream of patients. The Device was designated a "Class III" device, which was the FDA's highest risk category for human use. The Device worked in tandem with a dialysis machine, which

pumped blood from a patient through a cylinder to be filtered of pathogens before returning to the patient's body.  ExThera had not obtained FDA premarket approval for commercial distribution of the Device or use on patients in the United States.  Depending on its intended use and labeling, the Device had multiple names, including the Seraph® 100 Microbind® Affinity Blood Filter (Seraph 100) and the ONCObind™ Procedure Hemoperfusion Filter.

31.    In April 2020, ExThera received an Emergency Use Authorization ("EUA") from the FDA to treat certain patients with confirmed COVID-19 infections who were (i) "admitted to the intensive care unit (ICU) with" (ii) "confirmed or imminent respiratory failure."  The FDA's EUA for the Device reflected conclusions that the Device "may be effective at treating certain patients with confirmed COVID-19" and "may provide clinical benefit."  The EUA expressly prohibited ExThera from stating or suggesting that the Device was "safe or effective for the prevention and treatment of COVID-19."  ExThera agreed to withdraw the EUA in or around October 2025.  ExThera also obtained Investigational Device Exemptions allowing for certain limited clinical study uses, including treating sepsis and a certain form of pancreatic cancer.  In Europe, the Device had received CE mark authorization for removal of blood-borne pathogens.

### Background

32.    Distributor and its affiliates established a clinic in Antigua to treat patients using the Device, including patients with cancer.  The first treatments were provided in or around early/mid-January 2024.

33.    In and around December 2023, Private Equity Firm obtained equity in ExThera, and ExThera and the Distributor entered into a distribution agreement under which the Distributor would purchase Devices, including through an upfront payment of $10 million, $3,676,111.93 of which was returned by ExThera when the parties' agreement was terminated in October 2024.

34.     When the Antigua Clinic first opened in and around January 2024, ExThera personnel, including Ilic, traveled to the site to train clinic personnel and observe the use of the Device on American cancer patients.  ExThera personnel—including Ilic—also spoke directly with patients and their family members about treatments with the Device, as well as with physicians who referred those patients to the Antigua Clinic.

35.     Some patients, many of whom were United States residents, agreed to pay, and did pay, up to approximately $45,000 to Distributor per trip for treatment with the Device.

### Adverse Events

36.     Although Ilic knew and understood the requirements for adverse event reporting, she intentionally failed to report adverse events associated with the Device for patients treated at the Antigua Clinic.

### A.     Ilic's Background and Knowledge

37.     As part of her job duties and responsibilities as the Chief Regulatory Officer, Vice President of Regulatory, Clinical, and Medical Affairs, Ilic was tasked with ensuring that ExThera's products complied with the regulations of the FDA.

38.     For example, ExThera's Medical Device Reporting Policy identified the Vice President of Regulatory and Clinical Affairs as the responsible official for evaluating adverse events or complaints against appropriate logic trees, determining whether an event was reportable, and if so, completing and submitting the appropriate reports.

39.     Ilic worked for more than twenty years in regulatory affairs, clinic development and full product life cycle management.  She described herself as an internationally recognized expert in the field of regulatory and clinical development strategy.

40.     Ilic had been credentialed with a Regulatory Affairs Certification (RAC) since 2004 and was recertified multiple times.

41.     During 2024, including while patients were being treated at the Antigua Clinic, Ilic was directly involved in advancing a U.S.-based clinical research study into the use of the Device in patients with cancer.  That clinical study was permitted under an Investigational Device Exemption issued by the FDA on or about July 13, 2023.  The clinical study required oversight by the FDA, as well as oversight and approval by the U.S. clinical cancer center hosting the study.

42.     Shortly before the Antigua Clinic began to treat patients with the Device, when experience with the Device in cancer patients was limited, Ilic documented her knowledge about potential Device-related adverse events in an email to some members of ExThera senior management.  On or about December 18, 2023, she explained in an email how side effects and/or adverse reactions could theoretically occur during use of the Device itself, as well as other related procedures.   These potential events included hypersensitivity reactions, hypotension, anemia/decreased hematocrit, hypovolemia, thrombocytopenia, cardiac dysrhythmia, hemolysis, hematoma formation at the venipuncture site, chest pain, and dyspnea.  Patients, including Patient 1 and Patient 2, or their family members, reported that they experienced some of these medical events after being filtered with the Device at the Antigua Clinic.

43.     Nevertheless, despite her experience, training, and knowledge of FDA adverse event reporting, Ilic did not properly address potentially reportable adverse events, including the deaths of two patients treated with the Device at the Antigua Clinic.

**B.     Ilic Concealed Patient 1's Post Filtration Experiences and Death from the FDA**

44.     Despite repeated contact with Family Member 1 over several months about Patient 1's status and issues related to Patient 1's treatment, Ilic intentionally failed to notify the FDA

regarding adverse events following Patient 1's use of the Device at the Antigua Clinic. Among other events, Ilic intentionally failed to report to the FDA Patient 1's death, acting with intent to defraud and mislead the agency.

### i.        Ilic Learned of Patient 1's Negative Experiences

45.        On or about February 7, 2024, Family Member 1 began communicating with Ilic about using the Device to treat Patient 1, who was battling advanced cancer.

46.        After speaking with Ilic, Patient 1 and Family Member 1 traveled to Antigua for filter treatments in February 2024. Patient 1 received filter treatments between on or about February 28, 2024, and March 3, 2024.

47.        Following the procedures, Family Member 1 updated Ilic about Patient 1's status, explaining that Patient 1 "felt worse" and experienced "more pain" in the first week following treatment at the Antigua Clinic.

48.        Ilic told Family Member 1 that Patient 1 was feeling worse because the filtering at the Antigua Clinic had caused "strong immune activation"—i.e., it was effective—and that increases in cancer detection testing indicated cancer die-off. Family Member 1 sent subsequent text messages in and around March 2024 to Ilic informing her that Patient 1's tumor markers were increasing and that Patient 1 "continued to feel bad." In addition, Family Member 1 told Ilic that Patient 1 had a "severe pleural effusion" and was "extremely short of breath." Family Member 1 continued to provide information to Ilic on Patient 1's bloodwork and reports.

49.        On or about March 13, 2024, Individual 1 emailed Executive 2 seeking additional information stating, "I am worried that two of my patients are getting worse after their filter treatment and I don't have enough information to deliver optimal care to those patients." Executive 2 forwarded this email to Ilic and others, stating Individual 1 "is worried that both patients are

showing evidence that the cancer is spreading and is considering [the] best path forward on their treatment."

50.    On or about March 14, 2024, Family Member 1 texted Ilic stating, "[Family Member 1] wanted to ask [Ilic] about tumor markers. [Patient 1's] CEA [which is a carcinoembryonic antigen, a protein that can be found in higher amounts in individuals with certain types of cancer] before filtering was 25.  This week it was 338."

51.    In and around late March 2024, in a telephone conversation about Patient 1's treatments, Family Member 1 asked Ilic if she was "strongly opposed to doing anything else to boost immune response like immunotherapy or chemo in between the filters."  Ilic replied that "chemo will totally destroy him."  Family Member 1 reported that she relied on Ilic's recommendation for Patient 1 not to use chemotherapy treatments.

52.    On or about April 6, 2024, Family Member 1 updated Ilic on the procedures in Antigua.  Family Member 1 wrote to Ilic that a filter had clogged and asked Ilic for her thoughts on why it clogged.  Ilic advised that Patient 1 should not get any additional filtering "knowing [Patient 1's] labs from last month."

53.    Approximately three days later, on or about April 9, 2024, Family Member 1 urgently wrote to Ilic, "This is an emergency and I need help. Please call me[.]"  Family Member 1 sent multiple reports accompanied by the message "What does this mean??!!!!" and a sad emoji. Family Member 1 texted that Patient 1's "scan was horrible and . . . clinical picture doesn't look good."  Ilic did not respond.

54.    Patient 1 died on or about April 18, 2024, after returning to the United States from the Antigua Clinic because of Patient 1's deteriorating health.  Family Member 1 sent Ilic a link to Patient 1's obituary on or about April 21, 2024.   Ilic did not respond.

ii. **Despite Awareness of Adverse Events Concerning Patient 1, Ilic Intentionally Failed to Report to FDA**

55. Executive 1 reported that on or about April 26, 2024, Ilic informed Executive 1 about Patient 1's death, that Ilic and Executive 1 discussed reporting requirements to the FDA of any serious adverse events, and that Ilic refused to report, despite her awareness of Patient 1's complications and death in the United States and her knowledge and experience with adverse event reporting. Ilic similarly did not document in ExThera's MDR files any reason why she concluded Patient 1's death was not reportable pursuant to FDA requirements.

56. In 2025, following public reporting about the Device and after Ilic was terminated, ExThera filed several adverse event reports with the FDA related to Patient 1's use of the Device to treat cancer outside the United States. Among other things, ExThera reported to the FDA that Patient 1 "saw progression of . . . cancer after treatment" and aggressive tumor growth, as well as a pleural effusion, trouble breathing, and other experiences following Patient 1's use of the Device at the Antigua Clinic.

57. When Ilic chose to conceal the death of Patient 1 from FDA, she was acting within the scope of her employment and with intent to benefit herself and ExThera.

C. **Ilic Concealed Patient 2's Post Filtration Experiences and Death from the FDA**

58. In March and April 2024, Ilic was also informed about Patient 2's treatment in Antigua. Despite her knowledge and awareness of Patient 2's status, Ilic failed to notify the FDA regarding adverse events following Patient 2's use of the Device at the Antigua Clinic. Among other events, Ilic intentionally failed to report to the FDA Patient 2's death, acting with intent to defraud and mislead the agency.

i.    **Ilic Learned of Patient 2's Negative Experiences**

59.    Patient 2 was diagnosed with liposarcoma in and around December 2023. According to Family Member 2, Patient 2's initial treatment plan was to try conventional chemotherapy and radiation treatment, with a plan to begin radiation on or about January 5, 2024, to attempt to shrink a tumor and relieve pain, followed by chemotherapy to begin on or about January 25, 2024. But in and around January 2024, Patient 2 and Family Member 2 learned of the Device and decided to try it.

60.    Patient 2's filter treatment timeline was pushed back multiple times. When they arrived at the clinic in Antigua on or about February 21, 2024, Family Member 2 stated that the treatment center was run down, had paint peeling down the walls, and dimly lit. Family Member 2 reported that Patient 2 underwent filtration using the Device three times over the next several days.

61.    Individual 2, the United States-based physician handling Patient 2's care, was in contact with Ilic and others about Patient 2's status.

62.    Individual 2 wrote an email to Ilic on or about April 15, 2024. In the message, Individual 2 reported that Patient 2 was "doing very poorly, quite critical condition" and "decided to be comfortable." Individual 2 passed on a message from Patient 2's father, stating that, among other things, Patient 2's internist reported Patient 2 was experiencing tumor lysis syndrome, a potentially life-threatening complication of cancer treatment. Patient 2's father stated that Patient 2's "heart was also acting up with really high brats to compensate for the really low blood pressure," had left leg pain, and was put on oxygen.

63.    Later that day, Individual 2 sent an email to Ilic and others. Individual 2 reported that the tumor was "50% larger" and Patient 2 moved to hospice care.

64.    Patient 2 died on April 19, 2024, within days of Patient 1 passing away.

## ii. Despite Awareness of Adverse Events Concerning Patient 2, Ilic Intentionally Failed to Report to FDA.

65.    Despite awareness of Patient 2's deteriorating condition and death, Ilic failed to report any adverse events to the FDA.  Ilic similarly did not document in ExThera's MDR files any reason why the deteriorating condition and death were not reportable pursuant to FDA requirements.

66.    In 2025, following public reporting about the Device and after Ilic was terminated, ExThera filed several adverse event reports with the FDA related to Patient 2's use of the Device to treat cancer outside the United States.  Among other things, ExThera reported to the FDA that Patient 2's tumor had grown significantly and that Patient 2 was diagnosed with tumor lysis syndrome following Patient 2's use of the Device at the Antigua Clinic. When Ilic chose to conceal the death of Patient 2 from the FDA, she was acting within the scope of her employment and with intent to benefit herself and ExThera.

### Financial Benefit

67.    By choosing not to report the deaths of Patient 1 and Patient 2 to the FDA, Ilic intended to defraud and mislead the FDA.  At the start of the Antigua Clinic, the stakes were high for both Ilic and ExThera.  ExThera stood on the brink of major financial success, having just secured $10 million and the potential for millions more in future distribution agreements.

68.    Around this time, Ilic was shepherding ExThera's first U.S. clinical study involving the treatment of cancer patients with the Device.  This clinical trial was potentially critical not only to Ilic's and ExThera's financial future, but also to securing FDA approvals for the Device, which would have opened the door to a much larger market.

69.	In addition to her salary and stock options for equity in ExThera, Ilic separately received payments from ExThera through another corporate entity under Ilic's control, which Ilic used to bill for consulting services provided to ExThera.  This provided Ilic with an additional, direct financial interest in suppressing adverse event reports that could threaten this lucrative arrangement, which personally benefited Ilic.  Ilic and ExThera potentially stood to lose financially if negative adverse event reports related to the Antigua Clinic were filed with the FDA.

70.	Although Ilic became aware of potentially reportable adverse events relating to Patients 1 and 2 in or about March 2024, she did not take steps to report those events or otherwise evaluate them for potential reportability to the FDA.  Between March 2024 and January 2025, ExThera paid Ilic approximately $661,563.48 in payroll, cash distributions, and payments to Consulting Entity, which Ilic owned and controlled.

71.	In total, ExThera's sales of Devices to the Distributor between May 2024 and December 2024 totaled $6,327,500. When the agreement between the Distributor and its affiliates and ExThera was terminated in October 2024, ExThera returned $3,676,111.93 to the Distributor.